

**THE BUSINESS COURT OF TEXAS**
**ELEVENTH DIVISION**

| | | |
|---|---|---|
| JEREMIAH COUNSEL CORPORATION, | § § § § | |
| *Plaintiff,* | § | |
| v. | § | Cause No. 25-BC11B-0031 |
| BEN YOUNG, *et al.*, | § § | |
| *Defendants.* | § § | |

## OPINION AND ORDER

### *Syllabus[1]*

*This opinion addresses (i) the boundary between a church's right to autonomy and its secular obligations as a nonprofit corporation; (ii) an association's standing to bring claims for declaratory relief and derivative claims under the Texas Business Organizations Code; (iii) the merits of cross-motions for summary judgment that challenge actions to amend governing documents, as well as the actions that followed the amendments; and (iv) the statutory jurisdiction of the Texas Business Court over claims against the church's former outside counsel.*

---

[1] This syllabus is provided for the convenience of the reader; it is not part of the Court's opinion and should not be relied upon as legal authority.



**THE BUSINESS COURT OF TEXAS**
**ELEVENTH DIVISION**

| | | |
|---|---|---|
| JEREMIAH COUNSEL CORPORATION, *Plaintiff,* v. BEN YOUNG, *et al.*, *Defendants.* | § § § § § § § § § | Cause No. 25-BC11B-0031 |

## OPINION AND ORDER

## I. INTRODUCTION

¶1 This case involves a dispute over the governance and governing documents of the Second Baptist Church of Houston, a nearly one hundred-year-old Texas church blessed with approximately 94,000 adherents. Disagreements over leadership in so large an organization may be inevitable, even among communities of like-minded believers. And any court would naturally feel reluctance to pick sides in such a dispute. Fortunately, that is not this Court's role. Rather, the United States and Texas Constitutions, and Texas case law applying them, task secular courts in such situations with a solemn duty: to decide legal

matters when appropriate, but to abjure the exercise of jurisdiction when it risks intrusion into the religious sphere.

¶2     Defendants Ben Young, Homer Edwin ("Ed") Young, Lee Maxcy, Dennis Brewer, Jr., and Second Baptist Church Corporation (the "Church"), collectively referred to herein as "Defendants," filed a summary judgment motion seeking dismissal of almost all claims[1] brought against them by plaintiff Jeremiah Counsel Corporation ("Plaintiff" or "JCC"). Defendant Brewer separately moved for summary judgment, on additional grounds, of all causes of action against him. Plaintiff JCC, in its motion for partial summary judgment, requests the Court to enter a declaratory judgment invalidating a 2023 vote to amend the Church's articles and bylaws, which eliminated member voting rights. This opinion addresses and resolves all issues raised by the parties' summary judgment cross-motions.

¶3     Before reaching the merits of the motions, however, the Court must clear two jurisdictional hurdles. The first is the boundary between a church's constitutional right to self-governance and its statutory obligations as a Texas nonprofit corporation. Relying on the First Amendment, Defendants argue that the church autonomy doctrine bars all but one of the Plaintiff's claims because this lawsuit concerns matters of faith and internal church governance.

---

[1] As several of my Business Court colleagues have pointed out, the terms "claim" and "cause of action" convey distinct meanings when used in a legal context. *See, e.g.*, *Sebastian v. Durant*, 2025 Tex. Bus. 4, ¶16, 707 S.W.3d 124, 127 (11th Div.); *C Ten 31, LLC v. Tarbox*, 2025 Tex. Bus. 1, ¶¶26–27, 708 S.W.3d 229, 243 (3d Div.); *Tema Oil & Gas Co. v. ETC Field Servs., LLC*, 2024 Tex. Bus. 3, ¶15, 705 S.W.3d 226, 231 (8th Div.). With apologies to my learned (and correct) colleagues, I use these terms interchangeably herein.

¶4      The second jurisdictional barrier is standing. Defendants argue that the Plaintiff—an incorporated association of disaffected Church members created solely to bring this lawsuit—lacks associational standing to pursue claims against the Church on behalf of its members. Defendants further contend that even if the association has such standing, it cannot "stack" derivative standing on top of associational standing to pursue those claims that belong to the nonprofit Church which, under the Texas Business Organizations Code ("TBOC" or "the Code"), must be brought by a member on the Church's behalf (the "Derivative Claims").

¶5      Only after surmounting these hurdles may a court reach the merits raised by these summary judgment cross-motions. By comparison, that merits question is relatively straightforward: Did Defendants validly amend the Church's governing documents to remove the members' historic right to vote for the Senior Pastor and Board members of their choice? If so, may this Court nonetheless adjudicate Plaintiff's Derivative Claims that attack the decisions Defendants made, both in revising the governance structure and then in taking certain challenged acts once empowered by it? We address the cross-motions, and these issues, in that order.

## II. THE FACTUAL AND PROCEDURAL BACKGROUND

### A. The Church and Its Governance Framework

¶6      Second Baptist Church was founded in 1928 as a Texas nonprofit corporation. For several decades, the Church operated under the 1928 Articles of Incorporation that created a Board of Trustees and, since at least 2005, it has adopted bylaws pursuant to the Articles. The Articles were amended once, in 1978, and until the 2023 vote was held, it was

3

these amended articles (hereafter, "the Articles"), that constituted the Church's certificate of formation—as that term is used in the Business Organizations Code.

¶7 It is undisputed that, under this framework, the Church operated with a representative governance structure that vested significant voting rights in the individual church members, including the right to approve or reject material changes to the corporate bylaws.[2] From 1978 until 2024, the Church was led by defendant Ed Young as its Senior Pastor.

### B. The Young Group Promulgates the 2023 Amendments

¶8 Sometime in early 2023, the individual defendants initiated a process to amend the Church's governing documents. JCC alleges this move was a departure from decades of selfless leadership designed to consolidate power within a specific group— namely, the Defendants (referred to in JCC's Petition as the "Young Group")[3]—in a manner Plaintiff believes to be detrimental to the congregation's historical oversight role.

¶9 This process culminated in late May 2023. On May 30, the Church Board of Trustees met and voted unanimously to approve amendments to the Articles of Incorporation and the First Amended and Restated Bylaws of Second Baptist Church (hereinafter "2023 Bylaws"), and to recommend their adoption to the congregation.[4] On

---

[2] It is undisputed that, prior to the challenged May 31, 2023, vote, the 1928 Articles (as amended in 1978) and the 2005 Amended Bylaws ("the 2005 Bylaws") were the Church's governing documents then in effect.

[3] The "Young Group" consists of the four individual defendants: Ed Young (former Senior Pastor), Ben Young (Ed Young's son and the current Senior Pastor), Lee Maxcy (Associate Pastor and Church Administrator), and Dennis Brewer (the Church's attorney). *See Plaintiff's Second Am. Pet.* at 6-10.

[4] *See Resolution of the Board of Trustees of Second Baptist Church*, May 30, 2023 (attached as part of Attachment 2 to the Affidavit of Lee Maxcy, Ex. A to *Defendants' Second Motion for Summary Judgment* ("the Maxcy Affidavit")).

4

the evening of May 31, 2023, the Church called a "Church Business Meeting" to vote on these amendments. Defendants had previously provided notice of this meeting on four occasions: twice in the weekly church newsletter circulated via email on May 19 and 26, and by oral announcement made during regularly scheduled weekend worship services on May 21 and 28, at each of the church's six locations (or "campuses"). The meeting notice stated:

> We have a meeting Wednesday night, May 31st, at 6 p.m. in the Woodway Fellowship Hall. The Church will have a Call [sic] Church business meeting to update our by-laws, to protect our ability to continue operating as a Biblical Church.[5]

¶10    The meeting went forward at the designated time and place. There, various church leaders presented provisions of the proposed amended bylaws, including via PowerPoint slides. Senior Pastor Ed Young also addressed the meeting and offered to answer questions. Then Bill Mearse, the former Chairman of the Deacons, conducted the vote: first to adopt the Amended Articles of Incorporation, then to adopt the 2023 Bylaws. Defendants contend that a "clear" and "overwhelming" majority voted by a show of hands to approve both the amended articles and bylaws.[6] The votes tallied 315-2 in favor of approving both sets of amendments.[7]

---

[5] *Defendants' Second Motion for Summary Judgment* at 9. The newsletter announcements were almost identically worded: "Also, on Wednesday night, May 31, 6 p.m. in the Woodway Campus Fellowship Hall, the church will have a called Church Business Meeting to update our Bylaws to protect our ability to continue operating as a biblical church." *Id.*

[6] *Id.* No party disputes these background facts, although as noted below Plaintiff casts substantial doubt on the motives and candor of the Church leadership in calling for and conducting the votes. The amendments' presentation and voting process are attested to in the Maxcy Affidavit, at ¶¶12–16.

[7] *See id.* at Attachment 2 (Minutes of Called Church Business Conference, May 31, 2023).

5

¶11    The 2023 Bylaws purported to change several aspects of Church governance.

Those most relevant here include:

- **Removal of Voting Rights.** All member voting rights (at minimum, to elect the Senior Pastor, Board members, officers, committee members, to vote on amendments to governing documents, and to approve expenditures and certain business dealings) were abolished, removing the congregation's historical governance role.

- **Selection of Senior Pastor and Self-Perpetuating Board:** Core governance transitioned from a Board of Trustees to a self-perpetuating board, the "Ministry Leadership Team" (hereafter, "MLT"), removing Trustee oversight. Per the 2023 Bylaws, the MLT is composed of the Senior Pastor, individuals initially appointed by the Senior Pastor and, thereafter, any additional individuals whom the Senior Pastor may nominate and the MLT may elect.[8] The right to elect the Senior Pastor belongs solely to the Senior Pastor; and the MLT's ability to remove the Senior Pastor is circumscribed.

- **Asset Control:** The MLT was granted broad discretion over Church assets.

---

[8] *See* 2023 Bylaws §§ 5.01, 5.03, Ex. 5 to *Plaintiff's Motion for Partial Summary Judgment*. As provided for by §5.02, the MLT's powers are unquestionably far-reaching:

> The MLT shall be considered the board of directors of the Church, the governing body of the Church, and shall have all the rights, powers, and responsibilities of a board of directors pursuant to the [Texas Business Organizations] Code, subject to any limitations under the Code, the Articles of Incorporation of the Church, and these Bylaws. All corporate powers shall be exercised by or under their authority, and they shall have final authority for affairs pertaining to property and other temporal matters as required by civil law for nonprofit corporations. They shall be responsible for the acquisition and disposition of Church property, which includes the management of its financial resources, and shall have the power to buy, sell, mortgage, pledge or encumber any church property and incur related indebtedness.

**C. This Lawsuit Follows**

¶12    On April 15, 2025, JCC—a Texas nonprofit corporation formed as an association of long-standing current or former Church members—filed this lawsuit challenging the vote held almost two years earlier, as well as certain later actions taken by the MLT.[9] JCC asserts its standing to sue as an association of concerned Church members and ex-members, and also derivatively on behalf of the Church itself.

¶13    JCC's complaints are multi-faceted and detailed. But in essence, it accuses Defendants—acting initially on Ed Young's determination to secure his son's ascendance as his successor—of scheming to foist upon Second Baptist a "megachurch" model of tight, "dictatorial" governance.[10] To this end, JCC alleges, the Young Group drafted the challenged amendments, misled the Board and the membership as to their intended effect and purpose, and thereby suppressed turnout and secured their approval.

¶14    JCC challenges this vote as fraudulent, a breach of fiduciary duties, and as failing to comply with applicable TBOC provisions. JCC seeks to void not only the vote, and the resulting amendments, but also the "initial fruits" of the revised governance structure borne approximately one year later, on May 26-27, 2024, when (i) Ed Young appointed son Ben Young to replace him as Senior Pastor; (ii) Ben Young dismissed Ed

---

[9] JCC initially filed suit in the 55th District Court of Harris County, Texas, Cause No. 2025-26607; *Jeremiah Counsel Corp. v. Ben Young, et al.* Defendants removed the action to the Business Court on June 9, 2025.

[10] *See Plaintiff's Second Am. Pet.* at 5 (alleging that "Second Baptist's founding principles of shared governance, trust, and service to the faithful were to be abandoned in favor of a 'megachurch' autocracy more concerned with the getting of dollars than the teaching of charity and goodwill."); *id.* at 9 (asserting that Ed Young "wanted the power to simply appoint Ben Young as his successor—without any need to be anxious about whether his son would actually be selected if Church members were to follow the traditional method"); *id.* at 22 (claiming that "[u]nder the purported Bylaws 'updates,' the Senior Pastor would also have nearly dictatorial authority over church business and staff").

Young from further involvement with the Church and nominated his friends and family members to the MLT to consolidate his control; and (iii) the MLT transferred ownership of "The Winning Walk" to Ed Young.[11] JCC also fears the "future implications" of the revised governance structure: "Without an independent Board of Trustees and enfranchised members, there is nothing to prevent the plundering and wholesale dismantling of Second Baptist."[12]

¶15    JCC's petition recites a litany of claims in support of these challenges: (i) for declaratory relief pursuant to Tex. Bus. Orgs. Code §22.512(b)(3)(A), to void the amended articles of incorporation and bylaws; (ii) for breaches of fiduciary duty, *ultra vires* acts, fraud, tortious interference with contracts, and civil conspiracy to commit same, seeking damages derivatively on the Church's behalf; (iii) for conversion of The Winning Walk, seeking damages derivatively on the Church's behalf; (iv) for an accounting; and (v) for injunctive relief, to bar the MLT and Senior Pastor Ben Young from seeking to exercise any powers purportedly conferred upon them by the 2023 Bylaws or from taking any non-*de minimis* act inconsistent with the 2005 Bylaws.[13]

---

[11] *See generally Plaintiff's Second Am. Pet.* at 28. According to JCC, "The 'Winning Walk' is a copyrighted multi-media platform that uses a website, books, videos, podcasts of sermons and church messages, and an on-line bookstore to share the Second Baptist ministry with people across the country." *Id.* "This program," JCC further alleges, "was developed by Second Baptist's employees and officers using church resources, funds and facilities and constitutes the intellectual and physical property of the Second Baptist congregation." *Id.*

[12] *Id.* at 29.

[13] *See generally Plaintiff's Second Am. Pet.* at 29-44.

¶16     This is sweeping relief, that implicates broad swathes of the Church's internal management, governance, and direction. Accordingly, before proceeding further, the Court must first address whether it may even exercise jurisdiction over the matter. Defendants' summary judgment motion forthrightly asserts, on page one, that it cannot: "This lawsuit is barred by the church autonomy doctrine."[14]

## III. THE CHURCH AUTONOMY DOCTRINE ANALYZED

### A.  The Church Autonomy Doctrine Protects Religion from Secular Intrusion

¶17     The church autonomy doctrine, frequently referred to as the ecclesiastical abstention doctrine, arises out of the First Amendment to the United States Constitution and Article I, Section 6 of the Texas Constitution, which forbid secular civil courts from adjudicating theological controversies.[15] The doctrine affords broad constitutional protection, reflecting "the general rule that religious controversies are not the proper subject of civil court inquiry, and that a civil court must accept the ecclesiastical decisions of church tribunals as it finds them."[16] As the Texas Supreme Court states: "[c]hurches have a fundamental right to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine. It is a core tenet of First

---

[14] *Defendants' Second Motion for Summary Judgment* at 1.

[15] Many courts (including this one) casually refer to the church autonomy doctrine in jurisdictional terms. But, as United States Fifth Circuit Judge Andrew Oldham has explained, it is in fact a substantive constitutional immunity defense, not a jurisdictional bar: "it generally produces a judgment on the merits with prejudice . . . ." *McRaney v. N. Am. Mission Bd. of S. Baptist Convention, Inc.*, 157 F.4th 627, 641 (5th Cir. 2025).

[16] *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 713 (1976).

Amendment jurisprudence that, in resolving civil claims, courts must be careful not to intrude upon internal matters of church governance . . . ."[17]

¶18 To avoid unconstitutional church-state entanglement, Texas has adopted the "neutral principles of law" approach, ensuring that religious organizations are afforded the same legal regularity as secular entities when they choose to utilize state-sanctioned corporate forms.[18] Historically, many jurisdictions, including Texas, had applied a "deference rule" to religious disputes, requiring civil courts to defer to a church's highest internal authority.[19] But the Texas Supreme Court has since acknowledged that the deference rule often injects civil judges into an "impermissible inquiry" into theological disputes and, further, risks creating a "two-tiered system" that potentially immunizes religious corporations to operate "lawlessly" under the same statutes that would not countenance such conduct if engaged in by secular incorporated entities.[20] Today, neutral principles are the "exclusive methodology" that Texas courts apply.[21]

¶19 Application of the church autonomy doctrine—and, by extension, neutral principles of law—should sanction neither lawlessness nor entanglement.[22] And thus, the

---

[17] *Westbrook v. Penley*, 231 S.W.3d 389, 397 (Tex. 2007) (cleaned up).

[18] *Masterson v. Diocese of Nw. Tex.*, 422 S.W.3d 594, 603 (Tex. 2013).

[19] *See Watson v. Jones*, 80 U.S. 679, 727 (1871).

[20] *See Masterson*, 422 S.W.3d at 605–06.

[21] *Episcopal Diocese of Fort Worth v. Episcopal Church*, 602 S.W.3d 417, 424 (Tex. 2020). *See also Masterson,* 422 S.W.3d at 607 ("to reduce confusion and increase predictability in this area of the law where the issues are difficult to begin with, Texas courts must use only the neutral principles construct.").

[22] *McRaney*, 157 F.4th at 635-36 ("The doctrine does not grant religious institutions . . . a general immunity from secular laws. Its purpose includes safeguarding religious institutions' autonomy with respect to internal management decisions that are essential to the institution's central mission.") (cleaned up).

doctrine imposes a double duty: courts must avoid intruding into the religious sphere, but simultaneously "Texas courts are bound to exercise jurisdiction vested in them by the Texas Constitution and cannot delegate their judicial prerogative where jurisdiction exists."[23]

¶20    Here, as in the Texas Supreme Court's recent Southern Methodist University case, Second Baptist "chose to establish [itself] as a nonprofit corporation subject to Texas corporations law" and, therefore, JCC's claim that the vote to amend the Church's governing documents failed to comply with TBOC may be resolved by the application of neutral principles of law; indeed, "by looking solely to Texas statutes and [the Church's] articles of incorporation." *S. Methodist Univ.*, 716 S.W.3d at 482; *see also id.* at 498 (Young, J., concurring) ("[w]hen a religious organization chooses the corporate form for one part of its mission . . . the government, including the courts, must respect and uphold that choice.").

¶21    Because the church autonomy doctrine is not an "all-or-nothing" bar, the Court must conduct a claim-by-claim analysis to determine whether neutral principles of

---

[23] *Masterson*, 422 S.W.3d at 606. *See also id.* at 596 (endorsing neutral principles "because it better conforms to Texas courts' constitutional duty to decide disputes within their jurisdiction while still respecting limitations the First Amendment places on that jurisdiction."); *S. Methodist Univ. v. S. Cent. Jurisdictional Conf. of the United Methodist Church*, 716 S.W.3d 475, 494–497 (Tex. 2025) (Young, J., concurring) (calling the church autonomy doctrine "a constitutional principle of literally transcendent importance" pursuant to which "[s]ometimes a court must decline to exercise jurisdiction over part or all of a case; sometimes the exact opposite is true."); *id.* at 503 ("a talismanic dismissal of cases for 'lack of subject-matter jurisdiction' risks closing the courthouse doors to religious organizations, rendering them helpless to protect their constitutional rights and achieving the exact opposite of the religious-liberty aspirations of our constitutions. In proper circumstances, therefore, the church-autonomy doctrine may require a court to exercise jurisdiction and rule for the religious entity on the merits—not because of any religious inquiry but because of the church-autonomy doctrine's substantive reach.").

law permit or prohibit the exercise of jurisdiction.[24] For purposes of this analysis, JCC's several claims may be grouped into four distinct categories:

- Declaratory relief regarding the validity of the 2023 amendments;

- Derivative Claims (*ultra vires* acts, fraud, breaches of fiduciary duty and civil conspiracy to commit same; tortious interference with contracts, conversion of The Winning Walk;

- Claim for an accounting; and

- Injunctive relief.

## B. The Court Has Jurisdiction to Determine the Validity of the 2023 Amendments

¶22    JCC argues, and Defendants now concede,[25] that the notice and validity of amendments to a nonprofit's corporate articles of incorporation and bylaws are secular, not ecclesiastical, matters. The Court agrees. Indeed, any contrary argument—that the church autonomy doctrine automatically bars such an inquiry—appears plainly foreclosed by Texas Supreme Court precedent.[26] Accordingly, the Court will address below the merits of the matters raised in the parties' cross-motions for summary judgment: whether the

---

[24] *See Tilton v. Marshall*, 925 S.W.2d 672, 675-80 (Tex. 1996).

[25] *See Defendants' Response to JCC's Supplemental Filing* at 1-2.

[26] *See Masterson*, 422 S.W.3d at 609 ("Absent specific, lawful provisions in a corporation's articles of incorporation or bylaws otherwise, whether and how a corporation's directors or those entitled to control its affairs can change its articles of incorporation and bylaws are secular, not ecclesiastical, matters."); *Episcopal Diocese*, 602 S.W.3d at 424 ("Texas corporations law dictates how the corporation can be operated, including determining the terms of office of corporate directors, the circumstances under which articles and bylaws can be amended, and the effect of the amendments") (cleaned up); *S. Methodist Univ.*, 716 S.W.3d at 506 (Young, J., concurring) ("the articles of incorporation of a Texas corporation either were validly amended, or they were not. These are not the kinds of cases that the church-autonomy doctrine bars at the courthouse door.").

Church's amendments process complied with TBOC and whether and to what extent the Court should declare invalid the vote on the 2023 amendments.

### C. The Church Autonomy Doctrine Bars Plaintiff's Derivative Claims

¶23    JCC claims that as officers, agents, or attorneys the Defendants owed fiduciary duties to Church members, and breached them by failing to disclose that the 2023 Bylaws would abolish their right to vote on Church governance matters:

> Rather than faithfully serving Second Baptist and its members, H. Edwin Young, Ben Young and Lee Maxcy put their own interests above the interests of the 94,000 members of Second Baptist. Although retained by Second Baptist, Brewer counseled H. Edwin Young, Lee Maxcy and Ben Young on taking the surreptitious steps needed in their attempt to seize control of Second Baptist's governance, and to obtain control of Second Baptist's property, financial assets and facilities for their own purposes.[27]

¶24    Defendants counter that all of JCC's Derivative Claims are barred because Defendants acted in furtherance of the Church's religious mission and any judicial inquiry into the propriety of their choices would necessarily intrude upon the Church's right to structure its internal governance free from secular interference.

¶25    In assessing whether the Church autonomy doctrine bars the exercise of jurisdiction over these claims, the Court must assume (without yet deciding) that the 2023 amendments were validly adopted. For, if they were not, then JCC is due declaratory relief pursuant to the application of neutral principles; and, presumably, the challenged actions taken in reliance upon the amendments will be deemed void (or voidable)—thereby mooting

---

[27] *Plaintiff's Second Am. Pet.* at 32.

13

the breach of fiduciary duty and *ultra vires* claims. If, however, the Court deems the amendments valid, then the neutral principles inquiry will have been satisfied; and any further judicial scrutiny of actions the MLT later took in accordance with the amendments—especially to the extent that they implicate core governance decisions (*e.g.,* the hiring and firing of the Senior Pastor, changes to the structure of Church leadership, the internal input afforded Church members, and the use and transfer of Church assets and property)—risks the very entanglement that the church autonomy doctrine renounces.[28]

---

[28] *Harris v. Matthews*, 643 S.E.2d 566, 570–71 (N.C. 2007) (cleaned up) is a North Carolina Supreme Court case involving a church dispute much like the one presented here:

> Civil court intervention into church property disputes is proper only when relationships involving church property [have been structured] so as not to require the civil courts to resolve ecclesiastical questions. When a congregational church's internal property dispute cannot be resolved using neutral principles of law, the courts must intrude no further and must instead defer to the decisions by a majority of its members or by such other local organism as it may have instituted for the purpose of ecclesiastical government.
>
> . . . .
>
> In *Atkins v. Walker*, 200 S.E.2d 641 (N.C. 1973), the plaintiffs could have challenged the validity of church action by showing that such action was not taken in a meeting duly called and conducted according to the procedures of the church. However, because nothing in the record suggested that any actions of which the plaintiffs complained were not properly taken at a meeting of the church's governing body (the congregation), we concluded the trial court's decision could only have been based on factors that it was constitutionally prohibited from considering.
>
> . . . .
>
> Here, for example, in order to address plaintiffs' claims, the trial court would be required to interpose its judgment as to both the proper role of these church officials and whether each expenditure was proper in light of Saint Luke's religious doctrine and practice, to the exclusion of the judgment of the church's duly constituted leadership. This is precisely the type of ecclesiastical inquiry courts are forbidden to make.

*See also generally Mouton v. Christian Faith Missionary Baptist Church*, 498 S.W.3d 143, 150 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (finding that in church dispute over plaintiff's attempt to succeed his

¶26    Thus, the Court agrees with Defendants and concludes that, in the absence of neutral principles of law to be applied to them, the church autonomy doctrine bars the exercise of jurisdiction over Plaintiff's Derivative Claims that relate to core Church governance decisions. The same analysis applies, and similarly bars consideration of Plaintiff's conversion cause of action for the decision to transfer Church property—The Winning Walk—to Pastor Ed Young. Whether this was a fit honorarium for a retiring Senior Pastor's decades of salutary service or, conversely, "waste" of corporate assets in violation of the MLT's fiduciary duties to the Church,[29] is a judgment question best left to believers, not to a secular court constrained to apply only neutral principles of law.[30]

---

deceased father as pastor, "appellants' claims were inextricably intertwined with the selection of the church's new pastor (Wilson) and the church's expulsion of members (appellants)—two issues long recognized to be inherently ecclesiastical and of prime importance to the exercise of religious liberty. Texas courts have long recognized that courts should not involve themselves in matters relating to the hiring, firing, discipline, or administration of clergy.") (cleaned up); *Westbrook*, 231 S.W3d at 397 ("It is a core tenet of First Amendment jurisprudence that, in resolving civil claims, courts must be careful not to intrude upon internal matters of church governance"); *id.* at 402 (declining to consider civil liability for breach of fiduciary duty and related claims because "it is well-settled that [t]he interaction between the church and its pastor is an integral part of church government and [t]he relationship between an organized church and its ministers is its lifeblood.") (cleaned up).

[29] *See, e.g.,* RESTATEMENT OF THE LAW, CORPORATE GOVERNANCE § 4.05 cmt. a, illus. 2 and cmt. b (A.L.I., Tentative Draft No. 3, 2026).

[30] *See In re Godwin*, 293 S.W.3d 742, 745 (Tex. App.—San Antonio, no pet.) ("The determination of whether [the pastor] and [the church's] financial expenditures were proper in this case requires an inquiry into whether the expenditures were justified in light of [the church's] religious doctrine and practices. Because this is the type of ecclesiastical inquiry courts are forbidden to make, we conclude the trial court abused its discretion by asserting jurisdiction over [the former member plaintiff's] fraud claim."); *see also McRaney*, 157 F.4th at 637 ("The ministerial exception also bars common law claims that litigate the employment relationship between the religious organization and the employee. Courts have rejected a wide variety of torts that attack ministry staffing decisions . . . .") (cleaned up); *Harris*, 643 S.E.2d at 571 (in case challenging church leadership's transfer of assets to a North Carolina nonprofit as a misappropriation of church funds and breach of fiduciary duty, "plaintiffs argue [the church] is entitled to recover damages from defendants because they breached their fiduciary duties by improperly using church funds, which constitutes conversion. Determining whether actions, including expenditures, by a church's pastor, secretary, and chairman of the Board of Trustees were proper requires an examination of the church's view of the role of the pastor, staff, and church leaders, their authority and compensation, and church management. Because a church's religious doctrine and practice affect its understanding of each of these concepts, seeking a court's review of the matters

15

**D. Plaintiff May Pursue its Claim for an Accounting**

¶27    Lastly, that JCC may seek a secular court's intervention in pursuing its request for an accounting seems foreordained by the Church's initial election to organize itself according to Texas corporations law.[31] For the Texas Business Organizations Code secures the right of nonprofit corporation members "to examine and copy at the member's expense, in person or by agent, accountant, or attorney, at any reasonable time and for a proper purpose, the books and records of the corporation relevant to that purpose."[32] Like JCC's attack on the 2023 amendments process, part or all of this cause of action may be resolved by the application of neutral principles. Accordingly, and subject only to the Court's resolution of Defendant's summary judgment challenge to JCC's associational standing below,[33] the church autonomy doctrine does not stand in the way of JCC's accounting claim.

## IV. THE ANALYSIS OF JCC'S STANDING

¶28    Before the Court can reach the merits concerning the validity of the amendments, it must first address another threshold jurisdictional question: Does JCC have standing to bring this lawsuit? Plaintiff claims standing to sue Defendants in two

---

presented here is no different than asking a court to determine whether a particular church's grounds for membership are spiritually or doctrinally correct or whether a church's charitable pursuits accord with the congregation's beliefs. None of these issues can be addressed using neutral principles of law.").

[31] *See S. Methodist Univ.*, 716 S.W.3d at 482 (Young, J., concurring) (finding church autonomy doctrine no bar because "the [United Methodist Church] Conference chose to establish SMU as a nonprofit corporation subject to Texas corporations law.").

[32] TEX. BUS. ORGS. CODE §22.351.

[33] Defendants' summary judgment motion asserts no other contest to JCC's accounting cause of action.

16

distinct ways: (1) as an association of current or former Second Baptist members who were eligible to vote on the 2023 amendments, and (2) via derivative standing on behalf of the Church itself, under TEX. BUS. ORGS. CODE §20.002(c)(2). We address each ground in turn.

## A. JCC Has Associational Standing to Seek Declaratory Relief

¶29    An association has standing to sue on behalf of its members if it satisfies a three-prong test: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 447 (Tex. 1993) (*quoting Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333 (1977)).

¶30    JCC satisfies all three prongs.

¶31    **Member Standing**: Over 70 of JCC's members are, or were, long-standing members of Second Baptist who lost their voting rights due to the challenged amendments vote.[34] Furthermore, at least three of JCC's directors remain members of the Church.[35] These individuals possess distinct, concrete grievances, satisfying the first prong.[36]

---

[34] It is not clear on this summary judgment record exactly how many current or former Church members oppose the amendments vote, or even what is the total number of dissenters that JCC purports to represent. But seventy-one (71) of them (representing three of JCC's directors and sixty-eight members) swore out declarations attached to Plaintiff's motion for partial summary judgment reply brief, attesting that had they known the amendments were intended to abolish their voting rights they would have attended the May 31, 2023 meeting and voted "no." (This number includes some individuals who did in fact attend the meeting but allege their vote was misinformed.) *See Jeremiah Counsel Corporation's Consolidated Reply to Defendants' Response to Motion for Partial Summary Judgment* at Exs. 10-14.

[35] *Id.* at 6.

[36] "The first prong of associational standing may be satisfied if at least one of the organization's members would have standing individually." *Save Our Springs Alliance, Inc. v. City of Dripping Springs*, 304 S.W.3d 871, 878 (Tex. App.—Austin 2010, pet. denied).

¶32    **Germane Purpose:** JCC was explicitly chartered to "promote, develop, and restore integrity, accountable governance and donor protection for churches organized under Texas law, by endorsing member-elected independent boards of directors …."[37] JCC's lawsuit ties directly to its organizational mission.

¶33    **No Individual Participation Required:** When an association seeks prospective relief that benefits all injured members equally—like a declaration or injunction—individualized questions become irrelevant. JCC's request for a declaratory judgment that the 2023 Amended Articles of Incorporation and Bylaws are invalid and that the 1978 Articles and 2005 Bylaws therefore remain in effect, involves a pure question of law that requires no individualized fact-finding as to its members and that will apply uniformly to the congregation. Specifically, it entails no damages claims.[38] Accordingly, JCC meets the third and final prong of the test for associational standing. It possesses associational standing to pursue its declaratory and injunctive causes of action.

### B. JCC Lacks Standing to Pursue Its Derivative Claims

¶34    Plaintiff grounds its standing to pursue its Derivative Claims on behalf of the Church corporation on Chapter 20 of the Texas Business Organizations Code, and specifically TEX. BUS. ORGS. CODE §20.002(c). That section authorizes corporation

---

[37] *Plaintiff's Second Am. Pet.* at 1.

[38] *Cf. Tex. Ass'n of Bus.*, 852 S.W.2d at 447 ("an organization should not be allowed to sue on behalf of its members when the claim asserted requires the participation of the members individually rather than as an association, such as when the members seek to recover money damages and the amount of damages varies with each member.") (dicta).

members to bring representative lawsuits against current or former officers and directors but limits the suit's subject matter to *ultra vires* acts that fall into either of two categories:

- Acts "beyond the scope of the purpose or purposes of the corporation as expressed in the corporation's certificate of formation" or

- Acts "inconsistent with a limitation on the authority of an officer or director … as that limitation is expressed in the corporation's certificate of formation."[39]

¶35    None of JCC's Derivative Claims meet these criteria. The challenged actions do not lie beyond the scope of the corporation's purposes, whether as expressed in the certificate of formation (*i.e.,* articles of incorporation) or, more colloquially speaking, as a church. Nor, as explained below, is any challenged action contrary to or inconsistent with an expressed limitation stated in the articles.

### 1.  The Purpose Prong: The Actions Fall Within the Church's Scope

¶36    Regarding its purpose, the Church's Articles of Incorporation state:

"The purpose of this Corporation is, and shall be, the support of public worship according to the doctrine and customs of the Baptist Churches affiliated with the Baptist General Convention of Texas, and in connection with such support of public worship, to conduct and maintain such beneficent and charitable institutions as it may find necessary or desirable."

*Plaintiff's Second Am. Pet.* at Ex. 1, Art. III.

¶37    JCC's complaints regarding how Defendants conducted the vote to amend governing documents, staffing, leadership, and the management or transfer of church property do not contradict this stated purpose. Indeed, these are core administrative acts

---

[39] Tex. Bus. Orgs. Code §20.002(c).

that just about any religious institution could or would be expected to undertake. Unlike *Carmichael v. Tarantino Props., Inc.*, 604 S.W.3d 469, 475 (Tex. App.—Houston [14th Dist.] 2020, no pet.), in which officers were alleged to have acted beyond the scope by operating retail space entirely outside their condominium development, Defendants here engaged in internal governance entirely consistent with the Articles' broadly stated purpose, "the support of public worship."

¶38    JCC undoubtedly disapproves of the decisions and specific actions taken by the officers and directors. It may even be correct in doing so. But JCC's disapproval—merited or not—does not transform the exercise of these core corporate functions into *ultra vires* acts merely by alleging them to be tortious. They are *ultra vires* only if the corporation lacks authority to perform them.[40]

### 2.  The Limitation Prong: The Articles Contain No Expressed Limitations

¶39    JCC can likewise point to no violation of any expressed limitation on officer authority in the Articles. JCC relies heavily on Article XIII of the 2005 Bylaws, which requires a majority approval in a specially called church conference and "reasonable advance public notice" to modify the bylaws. But a bylaw is not an article and, crucially, TBOC Section 20.002(c)(2) requires the limitation to be "expressed in the corporation's certificate of formation." In contrast, the Articles do not contain any limitations restricting

---

[40] *See Carmichael*, 604 S.W.3d at 478 (finding condominium owners lacked Chapter 20 derivative standing to sue condominium association officers on non-retail space related matters because, unlike the derivate claims relating to the retail space, their "claims against the Officers for self-dealing and for failing to exercise judgment are not claims that the Officers committed acts beyond the scope of the Association's expressed purposes or that the Officers' actions are inconsistent with an expressed limitation on the Officers' authority.").

the authority of the officers or directors concerning notice, meetings, bylaw amendments, or the management of church property.[41] Absent the violation of a limitation expressed within the Articles, the statute provides no foothold for JCC's members to bring a derivative claim on behalf of the nonprofit corporation. JCC therefore lacks standing to pursue its Derivative Claims under TEX. BUS. ORGS. CODE §20.002(c)(2).[42]

¶40    Lastly, even if the acts of which JCC complains were found to constitute *ultra vires* acts, thereby supporting JCC's derivative standing, those claims nonetheless relate to core governance decisions of the Second Baptist Church whose validity cannot be adjudicated by the application of neutral principles of law. These, too, entail judgment calls about which reasonable people—and reasonable believers—may disagree. And here, too, JCC and the Church members may well have the more persuasive side of that disagreement. But for the same reasons stated above with respect to the church autonomy doctrine and its application to JCC's Derivative Claims, *see supra* at ¶¶23–26 & n.28, the Court is duty bound to abstain from exercising jurisdiction to resolve the churchgoers' disagreement.[43]

---

[41] It might plausibly be argued that Article VII (as amended in 1978) expresses a limitation on the management of Church property: "No part of the net earnings of the Corporation shall inure to the benefit of, or be distributable to, its members, Trustees, officers, or other private persons" except for reasonable compensation for services rendered or payments and distributions in furtherance of the support of public worship. *Plaintiff's Second Am. Pet.* at Ex. 2, Art. VII. But insofar as the Church transferred The Winning Walk to Pastor Ed Young in his capacity as (outgoing) Senior Pastor, and not as a member (which seems undisputed), it would appear that Defendants did not transgress this expressed limitation. On this summary judgment record, at least, JCC has not advanced that argument.

[42] Because the Court finds that JCC lacks standing to pursue derivative claims under Section 20.002(c)(2), it declines to address Defendants' alternative summary judgment ground asserting that JCC's derivative causes of action improperly "stack" associational and derivative standing. *See Defendants' Second Motion for Summary Judgment* at 21–22, 27–30.

[43] *See, e.g., Leach v. Gateway Church*, 2026 WL 1803733, at *8 (E.D. Tex. June 23, 2026) (abstaining from exercising jurisdiction over claims regarding seemingly non-religious conduct, such as funding, because

21

## V. THE MERITS OF THE CROSS-MOTIONS FOR SUMMARY JUDGMENT

¶41    Having established jurisdiction to apply neutral principles and confirmed JCC's associational standing to pursue declaratory relief, the Court turns to the merits: Did the Church validly adopt amendments to its governing documents?

¶42    This is a statutory question to be resolved under the Texas Business Organizations Code.

### A.  The Articles Were Not Properly Amended

¶43    Texas law requires a nonprofit corporation to give its voting members written notice containing the proposed amendment or a summary of the changes.[44] The May 2023 amendment to Article V of the 1928 Articles of Incorporation is invalid because Defendants failed to provide the mandatory statutory notice.

¶44    The record reflects that the only notice provided to members related to the bylaws. No notice of any kind—written or oral—was given respecting the Articles. Defendants concede this point.[45] Accordingly, the Court will grant JCC's motion for partial summary judgment on this issue.

### B.  The Bylaws Were Properly Amended

¶45    The Business Organizations Code draws a clear line between secular nonprofits and churches with respect to the notice required to call a meeting: "A corporation

---

evaluating "'global missions,' 'Jewish ministry partners,' 'local, national, and internal outreach efforts'. . . will necessarily implicate questions of faith, scripture and religious doctrine.").

[44] TEX. BUS. ORGS. CODE §22.105(b).

[45] *Defendants' Response to Plaintiff's Supp. Filing* at 1.

***other than a church*** shall provide written notice of the place, date, and time of a meeting of the members of the corporation and, if the meeting is a special meeting, ***the purpose or purposes for which the meeting is called.***[46] The Code does not require written notice, or a stated purpose, for a church corporation like Second Baptist:

> Sec. 22.156. NOTICE OF MEETING.
>
> . . .
>> (b) ***Notice of a meeting of the members of a corporation that is a church is sufficient if given by oral announcement*** at a regularly scheduled worship service before the meeting or as otherwise provided by the certificate of formation or bylaws of the corporation.

TEX. BUS. ORGS. CODE §22.156(b) (emphasis added).

¶46     The Code required of Defendants no more than that they orally notify the members of the May 31, 2023 meeting. It is not disputed that they did that, and more—they also supplied the written announcements set out in the two weekly newsletters that preceded the meeting. By applying neutral principles of law, the Court may declare that the vote to amend the Bylaws complied with the Texas Business Organizations Code.

### C.  The Court Cannot Adjudicate JCC's Fraud Allegations

¶47     As noted above, TBOC's plain text belies any contention that Defendants were required to provide a purpose when they noticed the meeting to amend the bylaws. But, JCC contends, by volunteering a purpose ("to update our by-laws to protect our ability to continue operating as a biblical church"), Defendants thereby undertook a duty not to materially mislead the members. *See, e.g., Bombardier Aerospace Corp. v. SPEP Aircraft*

---

[46] TEX. BUS. ORGS. CODE §22.156(a) (emphasis added).

*Holdings, LLC*, 572 S.W.3d 213, 220 (Tex. 2019) (fraud by non-disclosure may occur when a party "made a partial disclosure that created a false impression" or "voluntarily disclosed some information, creating a duty to disclose the whole truth.").

### 1. JCC'S Fraud Claim Improperly Tests Defendants' Doctrinal Sincerity

¶48 JCC's complaint—that the stated purpose misrepresented the leadership's true motivations—underlies its fraud and breach of fiduciary duty claims. To prove its fraud cause of action, JCC must show that the Defendants made a knowingly false representation. According to the Texas Pattern Jury Charge (PJC):

> Fraud occurs when—
> 1. a party makes a material misrepresentation, and
> 2. the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion, and
> 3. the misrepresentation is made with the intention that it should be acted on by the other party, and
> 4. the other party [justifiably] relies on the misrepresentation and thereby suffers injury.

Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges—Business, Consumer, Insurance, Employment* PJC 105.2 (2024).

¶49 JCC grounds its fraud claim on a single premise: Defendants allegedly lied when they represented the May 31, 2023 vote's purpose as being "to update our by-laws to protect our ability to continue operating as a biblical church."[47] But a secular court cannot adjudicate this claim.

---

[47] *Defendants' Second Motion for Summary Judgment* at 9.

¶50     For, at its core, the church autonomy doctrine forbids a court to determine what is or is not religiously orthodox. JCC assures that its fraud claim can be resolved by applying neutral principles of law: it "does not depend on the meaning of anything that Defendants stated. It instead depends on what Defendants did <u>not</u> state or disclose."[48] Citing the above PJC provision, they contend they would thereby put to the jury the simple, non-doctrinal question: Was the stated purpose for the amendments truthful or misleading?[49] In JCC's own words:

> There exists no need for the Court or a jury to decide what the term "biblical" means. It does not matter what the term "biblical" means. What matters is—however Defendants may have described their purpose for the May 31 meeting—Defendants knew their description of the purpose was false and deceptive and knew that their true purpose for the meeting was something other than what they had stated to church members in the announcements. Defendants' use of the word "biblical" to hide their true intent does not deprive this Court of jurisdiction.[50]

¶51     JCC's argument poses an initial appeal. But further reflection compels a contrary conclusion: that, in order to decide whether Defendants' representation was false—much less knowingly so (which would require the Court to delve into Defendants' hearts and minds)—the Court foresees the need to take evidence (and perhaps expert testimony as well) as to what the Defendants meant by "operating as a biblical church."

---

[48] *Jeremiah Counsel Corporation's Consolidated Response to Motions for Summary Judgment* at 16 (emphasis in original).

[49] *Plaintiff's Supp. Filing to Address Questions From the Court* at 2–3.

[50] *Id.* at 3.

And almost certainly, also, what JCC's members—and the average Church member too, whether dissenting or supportive— understood when they read or heard the phrase.[51]

¶52    The relevant analysis is relatively straightforward: to decide the fraud question put to it, a jury would first have to define the meaning of "biblical church." Then, under the Court's and the PJC's direction, the jury would sift the theological evidence presented to decide whether Defendants' representation of purpose meets the standard that allows a secular Texas court to impose civil liability for common law fraud. It may be hyperbole to liken that inquiry to the "heresy trials" that the church autonomy doctrine proscribes. *See, e.g., Tilton*, 925 S.W.2d at 678 ("To avoid conducting 'heresy trials,' courts may not adjudicate the truth or falsity of religious doctrines or beliefs.").[52] But it bears a more than passing resemblance, given the inevitability of subjecting religious beliefs to cross-examination. As Chief Justice Phillips concluded in *Tilton* (in which then-Justice Hecht conceded the defendant pastor may well be a "sham and a fraud"[53]):

---

[51] The parties supplied no testimony or other evidence on this point in their summary judgment briefing. Nonetheless, a cursory Google search suffices to show that the phrase "biblical church" has meaning to believers, although its exact contours are far from clear based on this limited research. *See, e.g.,* Travis Lang, *Biblical Church Model*, Sermons by Logos, https://sermons.logos.com/sermons/517929-biblical-church-model (last visited July 8, 2026) (explaining that "[t]oday's church operates much like a business, but the Biblical church functioned more as a family," and noting departures from historical models regarding property ownership, formal membership, entertainment, seminary training, and baptism requirements). In short, the phrase has substance, and the judge or jury hearing this case would seemingly have little alternative but to take evidence and decide whether Defendants' statement of purpose comported with that substance or so substantially deviated from it as to constitute common law fraud.

[52] *See also McRaney*, 157 F.4th at 652-53 (barring adjudication of former minister's employment-related claims that would require analyzing intent of church's religious statements assessing his fitness for the mission and "spiritual leadership"); *id.* at 636 ("Even the very process of inquiry into a church's internal affairs can impinge on rights guaranteed by the [First Amendment].") (cleaned up).

[53] *Id.* at 692 (Hecht, J., concurring).

26

> As long as the representation forming the basis of the fraud claim is a religious doctrine or belief, it is constitutionally protected from judicial inquiry. . . . Consequently, the religious objector's sincerity is irrelevant when a claim of fraud is based solely on a statement of religious doctrine or belief.

*Id.* at 678 (cleaned up). Judge Oldham came to a similar conclusion: "can a secular court decide it was 'false' that [minister] McRaney's leadership lacked Christ-like character? To ask these questions is to answer them: No." *McRaney*, 157 F.4th at 651.

¶53    In short, and at minimum, for a court to evaluate the truth or sincerity of Defendants' statement of religious purpose for the May 31, 2023 vote would inextricably intertwine church and state in a doctrinal inquiry that is inconsistent with the religious liberty safeguarded by the United States and Texas Constitutions.

### 2. JCC's Fraud Claims Suffer From an Additional Defect

¶54    JCC's fraud by non-disclosure claims fail due to a non-jurisdictional difficulty as well. For it is black-letter law that "[a]s a general rule, a failure to disclose information does not constitute fraud unless there is a duty to disclose the information."[54] And, "[g]enerally, no duty of disclosure arises without evidence of a confidential or fiduciary relationship."[55]

¶55    JCC rests the requisite duty on Defendants' status as fiduciaries as officers and directors (and, in Brewer's case, an attorney) of the Church corporation:

> Defendants were officers and fiduciaries of Second Baptist and <u>owed a duty to make full disclosure</u> of all material facts to the relevant agent(s) of Second Baptist. . . . Defendants breached

---

[54]*Mercedes-Benz USA, LLC v. Carduco, Inc.*, 583 S.W.3d 553, 562 (Tex. 2019) (cleaned up).

[55] *Id. (quoting Insurance Co. of N. America v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998)) (cleaned up).

thus duty because they <u>did not disclose</u>, but intentionally kept silent, the fact that their purported amendments to the 2005 Bylaws would: (1) <u>abolish</u> the corporate right that all members had possessed for 95 years to vote, including the right to vote on any amendments to governing documents, (2) <u>abolish</u> the members' right to elect an independent corporate Board and replace that Board with a so-called "Ministry Leadership Team" controlled only by the Senior Pastor, and (3) <u>abolish</u> the members' right to elect their own corporate officers, including pastors, who are officers at Second Baptist.[56]

¶56    Texas law makes quite clear, however, that officers and directors of a for-profit corporation do not owe fiduciary duties to individual shareholders. The duty is owed to the corporation: "Absent an express undertaking to an individual shareholder, fiduciary duties generally flow to the corporation and its shareholders collectively, not to any particular shareholder." *In re UMTH General Servs., L.P.*, 725 S.W.3d 424, 431 (Tex. 2025). A case that JCC cites,[57] *Myer v. Cuevas*, 119 S.W.3d 830 (Tex. App.—San Antonio 2003, no pet.) confirms that the same rule holds true for nonprofit corporations like Second Baptist Church: "A corporate stockholder cannot recover damages personally for a wrong done solely to the corporation, even though he may be injured by that wrong." *Id.* at 836. Like the complainants in *UMTH* and in *Myer*, then, the Church members (and, by extension, JCC) cannot maintain a fraud cause of action based upon a fiduciary duty of candor or disclosure that the Defendants owe to the corporation, not to the members individually.[58]

---

[56] *Jeremiah Counsel Corporation's Consolidated Response* at 16 (emphasis in original).

[57] *See Jeremiah Counsel Corporation's Consolidated Response* at 18 n.12.

[58] As in *Myer*, 119 S.W.3d at 836, Plaintiff here does not allege that an informal or confidential relationship exists between the Church members and the Board. And Texas courts have been notably reluctant to find such a relationship, and impose the associated fiduciary duties, even in cases in which it has been pled and supported with evidence. *See, e.g., Pitts v. Rivas*, 709 S.W.3d 517, 528 (Tex. 2025) (in case involving alleged informal fiduciary relationship arising from a personal relationship of special trust and confidence, "this

28

¶57    This is not some hyper-technical distinction. At minimum, one suspects Second Baptist would find itself hard-pressed to fill officer and director positions were this Court to decree that they are potentially subject to civil liability to any one of the 94,000 members due to disagreements about proper church governance or whether they made incomplete (or no) disclosures on the subject. This is the exact "unworkable result" the Texas Supreme Court feared, and on that basis rejected the idea that such duties extend to members or shareholders outside of the close corporation setting:

> The principle of shareholder collectivity overcomes the "incompatible" nature of simultaneous duties owed to a corporation and duties owed to a particular shareholder, whose interests may not align with the corporate entity as a whole. In recognition of this tension, we have held that "a director cannot simultaneously owe these two potentially conflicting duties." Although a party might agree to undertake a duty to both a corporate entity and one or more of its shareholders—as may be the case for mutual shareholder agreements in closely held corporations—such an agreement should not be inferred without an express recognition of the shareholder as a party to the contract in its individual capacity.

*In re UMTH General Servs., L.P.*, 725 S.W.3d at 431 (cleaned up).

¶58    Thus, even if the church autonomy doctrine does not bar a civil court from adjudicating JCC's fraud claim, its underlying premise—that Defendants owed a duty of disclosure by virtue of their Church positions—is untenable as a matter of law.

---

Court has repeatedly held that the law will not lightly impose fiduciary duties on the parties in a business relationship."). JCC does suggest, however, that the Church's governing documents are a contract between the Church and its members, granting them enforceable rights as between them and the corporation. *See Jeremiah Counsel Corporation's Consolidated Response* at 21-22. The Texas Supreme Court recently rejected similar arguments in the corporate context. *See In re UMTH General Servs., L.P.*, 725 S.W.3d at 430-32 (rejecting shareholders' claim that the advisory agreement created individual rights rather than duties owed to the Trust and the shareholders collectively; and refusing to find the agreement conferred third party beneficiary status upon the individual shareholders).

29

¶59 The Court acknowledges that this conclusion will likely engender disappointment and frustration, if not far stronger reactions than that. It may strike many as unfair, or even as a dereliction of duty by the Court. That was not the Court's intention, but is a perhaps inevitable result of the church autonomy doctrine and the centrality to our country, our Constitutions, and to our people of the principle of religious freedom that it protects. Texas Supreme Court Chief Justice Blacklock has spoken eloquently of the potential inequities that application of the church autonomy doctrine can leave behind its wake:

> This may mean that some wrongs are not righted in this life, though it would be a mistake to assume that human judges, if given the chance, would always right them wisely. We preserve the independence of our most precious private institutions from the all-consuming power of the state by drawing clear lines and abiding by them, even if doing so seems—from our limited, imperfect perspective—to leave a wrong unrighted. Our Constitutions draw many such lines, none clearer than their protections for religion.[59]

---

[59] *In re Lubbock*, 624 S.W.3d 506, 520 (Tex. 2021) (Blacklock, J. concurring). *See also id.* (lamenting that until the end times come, "we are left, for now, with the ugliness of litigation as the least bad way to settle many of our differences."); *Godwin*, 293 S.W.3d at 746 n.2 (finding church autonomy doctrine bars court from considering claim over pastor's allegedly excessive gift because the church followed a scripturally-based practice of giving gifts and honorariums to those who provide service to the church); *Milivojevich*, 426 U.S. 696 at 714-15 ("it is the essence of religious faith that ecclesiastical decisions are reached and are to be accepted as matters of faith whether or not rational or measurable by objective criteria. Constitutional concepts of due process, involving secular notions of 'fundamental fairness' or impermissible objectives, are therefore hardly relevant to such matters of ecclesiastical cognizance."); *see also Our Lady of Guadulupe Sch. v. Morrissey-Berru*, 591 U.S. 732 (dismissing two religious elementary school teachers employment claims due to the ministerial exception, leaving the teachers with no legal recourse); *Westbrook*, 231 S.W.3d at 404–05 (acknowledging the State's interest in protecting citizens from violations of patient confidentiality, but holding that plaintiff's claims against her religious counselor were nonetheless barred by church autonomy).

**D. The 1978 Articles and the 2023 Bylaws Do Not Conflict**

¶60    The last prong of JCC's declaratory judgment attack on the May 31, 2023 vote relies upon an alleged conflict between the Articles and the 2023 Bylaws: that the former enshrines Church member's voting rights that the latter purports to abolish. If that is true, then the Articles and Bylaws would conflict on that material point. And, because TBOC §22.103(a) provides that "[a] provision of a certificate of formation of a corporation that is inconsistent with a bylaw controls over the bylaw," the Court in that circumstance would be compelled to declare that—at least with respect to their attempt to abolish members' voting rights—the 2023 Bylaws should be deemed void and of no effect *even if they were validly adopted.*

**1. The 1978 Articles Are Silent on Member Voting Rights**

¶61    In Article V, the Articles provide as follows:

> "This Corporation shall have Six (6) Trustees, ***who may be either elected annually,*** or in Classes with terms of office not exceeding three (3) years, as this Corporation, may from time to time, deem desirable."

*Plaintiff's Second Am. Pet. at Ex. 1* (emphasis added).

¶62    This is where JCC locates the original 1928 right of Church members to "elect" their Trustees. And that is one reading of the provision. But it is not the only reading of it. Noticeably absent from the Articles is any reference to *who* elects the Trustees.[60] To

---

[60] It is a true statement, for example, that the Pope is "elected" to lead the Vatican. But by the College of Cardinals, not by the Catholic Church's members. *See* Frank J. Coppa, *Papacy*, Encyclopedia Brittanica https://www.britannica.com/topic/papacy (last visited July 14, 2026).

determine that, one must resort to the Church bylaws.[61] Were the Court instead to read Article V as JCC suggests it should, it would require a re-write to insert the italicized additions below:

> This Corporation shall have Six (6) Trustees, who ~~may~~ *shall* be either elected *by the membership of the Church* annually, or in Classes with terms of office not exceeding three (3) years, as this Corporation**, *by a vote of the members,*** may from time to time, deem desirable.

¶63    As JCC states in its briefing, Texas courts analogize corporate governance documents to contracts between shareholders and the corporation.[62] This Court, like Texas courts generally, must construe corporate charters and contracts according to the words chosen by the authors. *See Primexx Energy Opportunity Fund, LP v. Primexx Energy Corp.*, 2025 Tex. Bus. 9, ¶137, 709 S.W.3d 619, 648 (1st Div. 2025) ("courts may not rewrite a contract under the guise of interpretation.") (citing *Sundown Energy LP v. HJSA No. 3 P'ship*, 622 S.W.3d 884, 889 (Tex. 2021)). Accordingly, the Court must decline JCC's invitation to rewrite the Church charter.

¶64    JCC points the Court to a second Articles provision that, it contends, also sets forth the Church members' historic voting rights—specifically,  Article IX of the 1978 Articles, which states:

IX.

---

[61] The Church knew how to guarantee members' voting rights when it chose to do so. The 2005 Bylaws state explicitly that "[e]very member of the church is entitled to vote at all church conferences, provided the member is present." *See* 2005 Bylaws, *Plaintiff's Motion for Partial Summary Judgment* at Ex. 3 **("Section 2. Membership Rights and Privileges").**

[62]  *See Jeremiah Counsel Corporation's Consolidated Response* at 21-22 & n.19 (*citing High Rd. on Dawson v. Benevolent & Protective Ord. of Elks of the U.S., Inc.*, 608 S.W.3d 869, 880 (Tex. App.—Houston [14th Dist.] 2020, pet. denied)).

The Amendment was adopted in the following manner:

The Amendment was adopted at a meeting of members held on January 18, 1978, at which a quorum was present and the Amendment received at least two-thirds (2/3) of the votes which members present or represented by proxy at such meeting *were entitled to cast.*

*Plaintiff's Motion for Partial Summary Judgment* at Ex. 2 (emphasis added).

¶65    This argument, however, confuses historical narrative with a substantive affirmation of the members' right to vote. A mere recital that members voted to approve amendments, whether pursuant to rights secured by the Articles or bylaws (it does not say), serves only to indicate how the Church operated under the rules in effect at that time. It does not mean that a board of directors can never legally change that practice, particularly so if that procedure is not secured by a substantive commitment set forth in the certificate of formation.

¶66    Accordingly, the Court finds that the Articles contain no express assignment of voting rights to members—nothing, certainly, that remotely approaches the clarity of those rights as set forth in the 2005 Bylaws: "Every member of the church is entitled to vote at all church business conferences, provided the member is present."[63] Because the Articles do not expressly provide members with the right to vote, there is no conflict with the bylaws, and therefore no basis for the Court to invalidate the amended Bylaws by operation of TBOC §22.103(a). The Court determines that the 2023 Bylaws are valid and effective, and will grant Defendants' motion for summary judgment on that ground.

---

[63] 2005 Bylaws, *Plaintiff's Motion for Partial Summary Judgment* at Ex. 3.

## VI. DEFENDANT DENNIS BREWER, JR.'S MOTION FOR SUMMARY JUDGMENT

¶67    Defendant Dennis Brewer, Jr. moved separately for summary judgment, and joined in the same church autonomy doctrine and TBOC compliance defenses presented by the other defendants' summary judgment motion. But he raises additional defenses unique to him, which this Court must separately address.

¶68    JCC seeks to hold Brewer liable for his involvement both in the Church's restructuring and in the subsequent actions of the Ministry Leadership Team. JCC's claims against him include the following:

- Fraud and breach of fiduciary duty;
- Derivative claims under TEX. BUS. ORGS. CODE §20.002(c);
- Civil conspiracy; and
- Equitable and injunctive relief.

¶69    These claims divide in two, based upon Brewer's distinct roles at the Church over time: first, his conduct as the Church's legal counsel in the events leading up to the May 31, 2023 vote; and, later, his actions as a new member of the Ministry Leadership Team in and after May 2024.[64] We address these two separate time periods in reverse chronological order.

---

[64] The parties seemingly agree that May 27, 2024 was the precise day when Brewer joined the MLT. *See Plaintiff's Second Am. Pet.* at 40 ("Notably, Brewer contends that he became an officer or director of Second Baptist no later than May 27, 2024."); *Defendant Dennis Brewer, Jr.'s Motion for Summary Judgment and Joinder in Defendants' Motion* ("Brewer's Motion") at 5 ("Plaintiffs allege correctly that Brewer was not an officer or director of Second Baptist Church until May 27, 2024.").

### A. Post-Appointment Conduct: the Church Autonomy Doctrine and JCC's Lack of Derivative Standing Bar Claims Against Brewer as a Corporate Officer

¶70    With respect to JCC's claims against Brewer for his conduct after joining the Ministry Leadership Team in 2024, JCC pleads that the new Church governance structure constitutes a continuing wrong; that, post-vote, the MLT persisted in committing *ultra vires* acts; and that Brewer should be held liable as a corporate officer to the same extent as the other defendants.[65] For the same reasons detailed above with respect to the Defendants generally, these claims likewise fail to surmount the two jurisdictional hurdles of the church autonomy doctrine and JCC's lack of derivative standing. The Court therefore lacks jurisdiction to adjudicate JCC's claims against Brewer relating to his post-appointment activities on the MLT.

### B. Pre-Appointment Conduct: The Texas Business Court's Limited Jurisdiction Over Civil Cases Excludes Legal Malpractice Claims

¶71    JCC's pleadings are clear, and no defendant disputes, that Brewer's sole role prior to joining the MLT in May 2024 was to serve as the Church's legal counsel, advising the Church leadership leading up to the May 31, 2023 vote to amend the governing documents.[66] JCC's petition describes the breach of fiduciary duty claim against Brewer thusly:

> Brewer likewise breached his fiduciary duties to Second
> Baptist. Brewer owed a duty to the church to disclose material

---

[65] *Plaintiff's Second Am. Pet.* at 40 ("Once he became an officer or director, Brewer is subject to remedies under Tex. Bus. Orgs. Code §§ 20.002 [sic] for these ongoing wrongs.").

[66] *Plaintiff's Second Am. Pet.* at 32 ("Upon information and belief, Plaintiff asserts that Dennis Brewer, Jr. had been retained by H. Edwin Young, Lee Maxcy, and/or Ben Young to act as an attorney on Second Baptist matters, and thus he also owed Second Baptist fiduciary duties.").

facts within his knowledge to his client Second Baptist. Because Second Baptist is a non-profit corporation and must act through human agents, this meant that Brewer owed a fiduciary duty to disclose material facts to the relevant actors for the church. The relevant actors in this case were the members of the church and also the members of Second Baptist's Board of Trustees. Brewer consciously chose not to disclose material facts within his knowledge to these groups.

*Plaintiff's Second Am. Pet.* at 33-34.

¶72     JCC's claims against Brewer arising out of this pre-vote time period fall squarely within the contours of the attorney immunity defense that Brewer asserts in his summary judgment motion:

Under Texas law, attorneys are generally immune from civil liability to nonclients for actions taken within the scope of legal representation if those actions involve "the kind of conduct" attorneys engage in when discharging their professional duties to a client. *Taylor v. Tolbert*, 644 S.W.3d 637, 642 (Tex. 2022). Brewer is entitled to this immunity from JCC's [sic] as a matter of law because JCC was not his client.

*Brewer's Motion* at 4.

¶73     Brewer emphasizes that neither the JCC nor any of its members were his client. Ordinarily, that showing might suffice to grant the summary judgment motion on Brewer's attorney immunity defense.

¶74     But this is no ordinary Court; the Texas Business Court's jurisdiction is narrowly circumscribed.[67] And, although JCC charges him with fraud and breaches of fiduciary duty, JCC's pleading is clear that Plaintiff's pre-May 2024 causes of action relate

---

[67] *See generally* TEX. GOV'T CODE §25A.004 ("Jurisdiction and Powers").

solely to his representation of the Defendants and the Church (and its members, they say) as their attorney.[68]

¶75    Under Texas's anti-fracturing doctrine, however, a plaintiff's sole legal recourse for such allegations sounds in legal malpractice. *See Crain v. Northern*, 2025 Tex. Bus. 49, ¶9-10, 728 S.W.3d 721, 728 (8th Div.) (*quoting Pitts v. Rivas*, 709 S.W.3d 517, 524 (Tex. 2025)) ("Texas has an anti-fracturing rule that has long-prohibited splitting a single legal malpractice claim into multiple causes of action. . . . A plaintiff cannot simply 'repackage [ ] allegations under the banner of additional claims' to avoid the application of the anti-fracturing rule.").

¶76    Because the Business Court's statute expressly prohibits it from exercising jurisdiction over legal malpractice claims, TEX. GOV'T CODE §25A.004(h)(3), the Court lacks even the power to sustain Brewer's attorney immunity defense on its merits. The Court may only dismiss the claim without prejudice. *See Crain*, 2025 Tex. Bus. 49, ¶20-22, 728 S.W.3d at 730-31 ("a court lacking jurisdiction over a claim is completely without power to do anything other than dismiss it.").[69]

---

[68] The Court has addressed, above, the extent to which fiduciary duties owed to a corporation may be actionable when asserted by that corporation's shareholders or nonprofit members. *See supra* at ¶¶56–57. While relevant to JCC's standing to assert Derivative Claims against Defendants generally, that question is not relevant here—given the Court's assessment that it lacks jurisdiction over the claims JCC brings against Brewer in his attorney capacity.

[69] No party's summary judgment briefing mentioned either the anti-fracturing rule or the Court's lack of jurisdiction over a legal malpractice claim; the Court first raised these matters, *sua sponte,* at the hearing on the cross-motions for summary judgment—consistent with its duty to do so. *See Lone Star NGL Prod. Servs., LLC v. EagleClaw Midstream Ventures, LLC*, 2024 Tex. Bus. 8, ¶12, 705 S.W.3d 243, 250 (11th Div.) ("For every judicial proceeding, subject-matter jurisdiction must exist before we can consider the merits, and a court must examine its jurisdiction any time it is in doubt.") (cleaned up). *See also* TEX. R. CIV. P. 355(f)(1), (3) (Business Court must remand any removed case on its own initiative if it determines that it lacks authority to hear the action).

¶77    The Court must therefore dismiss without prejudice all claims against Brewer based on his conduct prior to his appointment to the MLT. Those claims and causes of action targeting his post-appointment conduct, as noted above, shall be dismissed for lack of derivative standing; and, even if there is such standing, by application of the church autonomy doctrine.

## VII. JUDGMENT AND ORDER

¶78    For the reasons stated herein, the Court disposes of the parties' cross-motions for summary judgment as follows:

- **Church Autonomy Doctrine:** The Court **GRANTS** Defendants' motion for summary judgment regarding Plaintiff's fraud and other claims relating to the allegedly misleading, fraudulent, or non-disclosed nature of the May 31, 2023 vote notice as barred to consideration by this Court by application of the church autonomy doctrine. All claims predicated upon the allegation that the notice "to continue operating as a biblical church" was false or misleading are hereby **DISMISSED**. Further, the Court **GRANTS** Defendants' motion and hereby **DISMISSES** JCC's Derivative Claims because entertaining them would impermissibly entangle the Court in second-guessing the Church's governance and property decisions without the application of neutral principles—also in violation of the church autonomy doctrine.

- **Standing:** The Court **DENIES** Defendants' motion for summary judgment on the ground that Plaintiff lacks associational standing to pursue its direct causes of action against Defendants. The Court **GRANTS** Defendants' motion regarding Plaintiff's lack of standing to pursue the Derivative Claims under TEX. BUS. ORGS. CODE §20.002(c), and hereby **DISMISSES** the Derivative Claims against all Defendants.

- **Merits Determinations**: The only claims remaining following the above rulings on church autonomy and standing are JCC's declaratory judgment claims and the claim for an accounting. The Court **GRANTS IN PART** Plaintiff's Motion for Partial Summary Judgment and hereby **DECLARES** the 2023 amendment to Article V of the Church's Articles of Incorporation is invalid and ineffective. In all other respects, Plaintiff's Motion for Partial Summary Judgment is hereby **DENIED.** Defendants' motion for summary judgment regarding the validity of the 2023 Bylaws is hereby **GRANTED;** and, accordingly, JCC's declaratory judgment claim that the vote

38

thereon did not comply with the technical requirements of the Texas Business Organizations Code is hereby **DISMISSED WITH PREJUDICE.**

- **Claims Against Dennis Brewer, Jr.:** All claims made against Brewer that occurred before his appointment to the Ministry Leadership Team are **DISMISSED WITHOUT PREJUDICE** because Brewer was acting solely as an attorney and the Texas Business Court does not have jurisdiction over legal malpractice claims. All claims made against Brewer that occurred after his appointment to the Ministry Leadership Team are **DISMISSED** for the same reasons the claims are dismissed against the other defendants: church autonomy and JCC's lack of derivative standing.

- **Remaining Grounds:** To the extent not expressly granted or denied herein, all other relief sought by the parties' cross-motions for summary judgment is hereby **DENIED.**

SO ORDERED this 15th day of July, 2026.


JUDGE GRANT DORFMAN
TEXAS BUSINESS COURT
ELEVENTH DIVISION